IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 26, 2021

**CORDALRO STRICKLAND v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 296930   Don W. Poole, Judge**

_____

**No. E2020-00299-CCA-R3-PC**

_____

The Petitioner entered a plea of *nolo contendere* to the lesser-included offense of second degree murder, two counts of attempted first degree murder, and reckless endangerment. Thereafter, the Petitioner timely filed a post-conviction petition, alleging that he received the ineffective assistance of counsel. The post-conviction court denied relief, concluding that the Petitioner had not proven that Counsel was ineffective, and that the Petitioner's pleas were made knowingly and voluntarily. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Lloyd A. Levitt, Chattanooga, Tennessee, for the appellant, Cordalro Strickland.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Cameron B. Williams, Executive Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a shooting incident that occurred on July 3, 2011. A Hamilton County grand jury issued a six-count indictment against the Petitioner, charging him with the first degree premeditated murder of Melvin Fennell, attempted first degree murder and aggravated assault of Mariah Stoudemire, attempted first degree murder and aggravated assault of Calvin Garner, and reckless endangerment. The Petitioner and the State reached an agreement, and the Petitioner pleaded guilty to the lesser-included offense of second

degree murder, two counts of attempted first degree murder, and reckless endangerment. The State agreed to dismiss both counts of aggravated assault. Pursuant to the plea agreement, the Petitioner was ordered to serve a fifteen-year sentence for the second degree murder conviction and fifteen year sentences for each of the attempted first degree murder convictions. He was ordered to serve a two-year sentence for the reckless endangerment conviction. All of the sentences were to be served concurrently, for an effective sentence of fifteen years.

## A. Guilty Plea Submission Hearing

At the guilty plea[1] submission hearing, the State offered the following factual basis in support of the trial court's acceptance of the Petitioner's guilty plea:

> On or about July 3rd, here in Hamilton County, Tennessee, police were dispatched to a shooting at 818 Arlington Avenue here in Hamilton County, spoke with witnesses, one witness in particular, a Mariah Stoudemire, spoke with her some days later after she had recovered from being shot several times. She indicated that they were having a barbecue at that residence [on] Arlington Avenue, that were there [sic] several people there, including herself, an individual by the name of Melvin Fennell, also known as Brando, he's going to be the decedent in the case.

> She stated that she was sitting out on the porch, that an individual that she had not seen before walked up and asked her where Brando was. At that point, she called into the house where Mr. Fennell was located, he made his way out and then this individual that had walked up began shooting. This individual, who was later identified as the [Petitioner], struck Ms. Stoudemire several times, struck Mr. Garner at least once, and also struck the intended victim, Melvin Fennell, several times.

> Mr. Fennell was transferred to the hospital where he was later pronounced dead by hospital staff. The medical examiner's office determined that he died from gunshot wounds to his lower extremities.

---

[1] The Petitioner entered a "no contest" plea. We note that this court has held, "a conviction following a plea of *nolo contendere* has all the effects of a plea of guilty insofar as the purposes of the case are concerned. The only difference of substance is that a conviction following the entry of a plea of *nolo contendere* cannot be used against the accused as an admission in any civil suit for the same act." *Teague v. State*, 772 S.W.2d 932, 943 (citations and quotation marks omitted).

Mr. Karl Fields was assigned to the case, he instigated an investigation into the case. He developed [the Petitioner] as a possible suspect in this case. He compiled a photo lineup, and the Court heard testimony in the motion to suppress, previously, he compiled a photo lineup that included [the Petitioner] in it. The first photo lineup that included [the Petitioner], she wasn't able to pick anyone out definitively, although she did say that the picture, which was representation of [the Petitioner], looked familiar and that that possibly could be the suspect. That picture, apparently, was an old picture back from 2008.

Mr. Fields then went and got a more recent picture, included that in a different photo lineup and she was able to identify [the Petitioner] as the individual that shot her, Mr. Garner and Mr. Fennell on July 3rd, 2011. Arrest warrants were issued, [the Petitioner] was arrested sometime after that.

There was DNA, shell casings, and other things collected at the scene, there was a swab taken from a stain that appeared to be blood, from the southside of the residence, and that would be the general area that the shooter had been in. There was a swab taken of this stain, it was sent off to the TBI for examination and TBI determined that it was, it did in fact have [the Petitioner]'s DNA on it. He gave a statement to the police where he denied any involvement in it, said he'd never been over there.

Upon questioning by the trial court, the Petitioner agreed that he had discussed his pleas and the charged offenses with his appointed attorney ("Counsel"). The Petitioner stated that he was satisfied with Counsel and acknowledged that he had requested Counsel as his attorney. The Petitioner stated that he had a 12th grade education and had previously entered a guilty plea. The trial court reviewed the Petitioner's sentencing exposure with him and informed the Petitioner of his rights. The Petitioner affirmed that he was waiving those rights and entered his pleas. The trial court accepted the pleas and found that the Petitioner knowingly and voluntarily entered the pleas.

## B. Post-Conviction Petition

The Petitioner filed a motion to withdraw his guilty pleas, contending that he received the ineffective assistance of counsel. The Petitioner then filed a petition for DNA analysis, requesting testing of "all evidence that is in the possession or control of the prosecution, law enforcement, laboratory or court" related to his case. The Petitioner also filed a petition for post-conviction relief, asserting that counsel "failed to request independent testing of the DNA evidence analyzed by the [TBI]." Due to Counsel's failure to request independent testing, the Petitioner claimed that his guilty pleas were unknowing

and involuntary. Subsequent amendments to the petition were filed, adding claims and expanding upon the previous allegations in the petition.

The post-conviction court held a hearing that occurred over the course of three days: June 27, 2019, July 9, 2019, and October 16, 2019. During these hearings, the parties presented the following evidence: Chad Johnson, a Tennessee Bureau of Investigation ("TBI") quality assurance manager, explained that TBI forensic biologists[2] were responsible for identifying body fluids and generating DNA profiles from evidence. Mr. Johnson identified the final report he generated for the DNA testing conducted in this case. Over the course of his analysis, he received known DNA standards collected from Melvin Fennell, Calvin Garner, Mariah Stoudemire, and the Petitioner. Additionally Mr. Johnson received swabs collected from the crime scene.

Mr. Johnson testified that after DNA analysis, he concluded that a swab collected from the scene contained DNA that "matched up" with the Petitioner's known DNA standard. Mr. Johnson identified the TBI "quality control sheet" that listed all the components the TBI used for DNA testing. Mr. Johnson testified that sample 13a was a blood spatter spot collected from the south side of the Arlington residence. Sample 14a was a blood smear collected from the west wall of steps at the Arlington residence. He identified sample 17a as Mr. Fennell's standard, sample 27a as a standard from "Siler", sample 29a as the Petitioner's standard, and sample 30a as Ms. Stoudemire's standard. He explained the standards were known DNA samples collected from these individuals at some point after the shooting.

Mr. Johnson testified that no contamination occurred during his testing. After documenting his results, Mr. Johnson explained that, according to TBI procedure, another analyst reviewed the results. The analyst who reviewed Mr. Johnson's work made no errors in the analysis.

Mr. Johnson testified about the chain of custody documentation. Mr. Johnson identified an Official Serology Report he issued on December 22, 2011, indicating that he had tested sample 13a and 14a and the presumptive tests indicated the presence of blood. He tested only the crime scene samples because he did not yet have known standards to use for comparison. Mr. Johnson also identified a January 28, 2013 Official Serology/DNA report. Mr. Johnson explained that he issued this second report to acknowledge that the State had requested DNA testing but to notify the State that DNA

---

[2] Mr. Johnson testified that during the time period relevant to the DNA analysis done in this case, he was a TBI forensic biologist but had since been promoted.

testing had not been done because Mr. Johnson had not received standards for Ms. Stoudemire, Mr. Garner, and the Petitioner.[3]

Mr. Johnson identified an Official Serology/DNA Report dated April 5, 2013. The report listed Reginald Siler, the Petitioner and the victims, Mr. Fennell, Mr. Garner, and Ms. Stoudemire. The TBI received the Petitioner's buccal swabs on December 27, 2012, and Stoudemire's on March 14, 2013. By this time, exhibits 13a, 14a, 17a, and 27a had been retrieved by the Chattanooga Police Department, so Mr. Johnson had to request that those samples be submitted back to the laboratory.

Mr. Johnson acknowledged that on at least two occasions, reports were issued without additional testing because items were needed. He explained that transport of items between the TBI and police agencies was routine because

> when we finish testing an item, we give it back to evidence receiving, we put it in the vault as completed, because we have no way of knowing if additional testing is going to be requested and our vault space is limited, so they put it in there to be returned to the officer the next time they come in. When they come in, they pull everything that's there, give it back to the officer and, you know, they take custody of it at that time.

The last report was generated on August 28, 2013. The swabs from the crime scene analyzed were: 13a and 14a and standards from either a suspect or a victim: 17a (Melvin Fennell), 27a (Reginald Siler), 29a (the Petitioner), and 30a (Mariah Stoudemire). Mr. Johnson found that sample swab 13a, collected from the crime scene, matched the Petitioner's known standard. Sample swab 14a, also collected from the crime scene, matched Ms. Stoudemire's known sample.

Mr. Johnson testified that, on October 4, 2011, the TBI received two paper bags containing sample 13a and 14a, sealed with red evidence tape. Mr. Johnson confirmed that neither appeared to have been tampered with in any way. He tested the samples on December 17, 2011, and issued a serology screening report on December 22, 2011, indicating that the presumptive screening indicated that it was blood and that he needed known standards for further DNA testing. He received samples again in August 2013. He confirmed that the seals were still intact on the samples and there was no indication of tampering. The TBI then received two additional samples, known standard 29a (the

---

[3] Based upon discussion during the hearing, it appeared that the Petitioner had a buccal swab standard at the lab related to a separate homicide case; however, TBI policy prevented Mr. Johnson from using a standard from another case.

Petitioner) and 30a (Ms. Stoudemire). Both standards were in individual paper bags and sealed with blue evidence tape.

Mr. Johnson testified about TBI protocols to prevent cross-contamination. He explained that the scientists do not handle "question evidence items" at the same time that they handle or work with known standards. The TBI also required "blanks" or control samples to run with every case to indicate contamination. "Blanks" were run in the Petitioner's case, and there was no evidence of contamination. Additionally, the TBI will not use a known standard for an individual submitted for a different case. TBI standards require that each case have its own set of standards.

Counsel testified that she was appointed to the Petitioner's case, at his request, on May 12, 2014. The Petitioner's prior attorney had filed and argued a motion to suppress DNA evidence before withdrawing. Counsel recalled that the trial court postponed a ruling in order to allow Counsel to review the hearing and to supplement the motion if she so chose. Counsel testified that she had been practicing about three years when she was appointed to the Petitioner's case, and her practice had been mostly in the area of criminal law. Counsel confirmed that she thoroughly reviewed all discovery related to this case, including witness statements and crime scene video and photographs.

Counsel testified that Karl Fields was the lead detective on the Petitioner's case, but that he had been placed on administrative leave for misconduct by the time the Petitioner's case was set for trial. Counsel sought to introduce evidence of his improper conduct at trial to impeach Mr. Fields's credibility, but the trial court denied the motion. Counsel considered filing an interlocutory appeal but due to the proximity of the trial, she elected not to do so.

Counsel recalled reviewing the statement of Ms. Stoudemire's sister, Selinda Brewer. She did not believe Ms. Brewer's statement was helpful to either the State or the defense; however, she had reason to believe that Ms. Stoudemire had told Ms. Brewer that she could not identify the shooter. Counsel reviewed Mr. Garner's statement as well. She recalled that Mr. Garner was in New Orleans and unavailable for the trial. Counsel confirmed that initially none of the witnesses identified the Petitioner as the shooter. However, at the preliminary hearing Mr. Fields testified that after viewing a second photo lineup Ms. Stoudemire had identified the Petitioner as the shooter.

Counsel testified that, prior to trial, the TBI returned the DNA results indicating that the swab from the south side wall (13a) matched the Petitioner's DNA standard. Counsel testified that the strategy was to attack the DNA on two premises. The first was initiated by a prior attorney and entailed arguing that the crime scene was secured improperly, thereby compromising the DNA evidence. The second attack on the DNA evidence was

that the chain of custody was broken. Counsel detailed her strategy for attacking the DNA evidence, but she noted that "DNA is hard to overcome."

Counsel identified the documents associated with the Petitioner's guilty plea. Among these documents were letters negotiating with the State for an offer. In one of the letters written by Counsel, Counsel acknowledged the Petitioner's reluctance to enter a guilty plea.

On cross-examination, Counsel recalled that after her appointment in May 2014, the July trial date was moved to November 4, 2014. A few weeks after her appointment to the case, she successfully requested funding to hire an investigator. On September 8, 2014, she filed a request for expert funding, and the trial court granted her motion. With the funding, Counsel obtained the services of Bill Watson. Counsel obtained Mr. Johnson's complete file for Mr. Watson's review and arranged for Mr. Watson to speak directly with Mr. Johnson. Counsel personally checked the seals on the DNA evidence at the service center and photographed the items to send to Mr. Watson. Following his review, Mr. Watson opined that the there was not a sufficient sample of the DNA to do independent testing. Mr. Watson advised, "[t]hat the DNA profile was pretty good [after review of Johnson's files]." Counsel said:

> Basically, what I understood from hi[m] is while there were some little technicalities that could be used at trial on the DNA, like the fact that the stains on the wall were not measured by evidence collectors, that they did not confirm the presence of blood in the swab on the house, that, in the notes, the quantity was so small that they couldn't test it, but if it was that small, how would they see it on the wall.

> So, basically, he gave me things that I could use to cross-examine the State's expert at trial, but nothing really that totally reversed what that report said. And nothing that would render the admission of the DNA results inadmissible.

Counsel relayed this information to the Petitioner. Counsel went to the crime scene, photographed the wall, measured the impact mark from the bullet, measured from the ground to the impact mark and tried to determine angles from the shooter's perspective. Counsel confirmed that she filed a supplement to the original motion to suppress the DNA evidence in October 2014. The motion had been argued on March 4, 2014, by the Petitioner's prior attorney and the trial court denied the motion on October 30, 2014.

Greg Hampikian testified as an expert witness in the field of forensic genetics that he had reviewed TBI laboratory notes and reports related to this case, the motion to

suppress DNA, and a transcript of TBI agent Chad Johnson's testimony. Dr. Hampikian testified that the crime scene evidence should have been completely analyzed before the standard samples arrived and were analyzed because it reduced the opportunity for contamination of the evidence. Dr. Hampikian said that testing the standard samples after the crime scene evidence is "best practice." He contended that the TBI should have used the Petitioner's DNA standard sample from an unrelated case rather than have the Petitioner submit another sample. He also contended that the crime scene evidence and the Petitioner's sample were processed only hours apart and he considered that "very bad practice."

Dr. Hampikian testified that there are cases where juries either acquit or are hung based upon questions about how a DNA sample was handled. Dr. Hampikiam stated that the "statistics" from the DNA analysis in this case were "very strong" so he did not question that an "accidental match" had occurred; however, he did question how the evidence was collected, processed, and the risk of contamination. Dr. Hampikian also took issue with the fact that the TBI lab did not run a confirmatory test for blood following the presumptive test. He acknowledged that the technician elected not to do so due to the insufficient amount of material, but Dr. Hampikian believed a confirmatory test should have been done nonetheless.

Dr. Hampikian believed that "there would have been a lot for the, for a defense attorney to cross the expert who did this work on." He believed that the handling of the DNA should have been questioned in detail, but qualified this assertion, stating, "I'm not saying, you know, that I can provide any assurance on what a jury would do."

On cross-examination, Dr. Hampikian agreed that he did not dispute the TBI's findings that the Petitioner's DNA "matched" sample swab 13a.

After hearing the evidence, the post-conviction court issued an order, determining that the Petitioner's motion to withdraw the guilty pleas should be treated as part of the post-conviction petition and that the post-conviction petition was denied. It is from this judgment that the Petitioner appeals.

## II. Analysis

The Petitioner asserts that Counsel's failure to attack the DNA analysis on the basis that the DNA may have been contaminated at the TBI laboratory constitutes ineffective assistance of counsel. He also claims that Counsel's explanation to him of the DNA issue was insufficient to allow him to make a knowing decision as to whether to enter a guilty plea. The State responds that Counsel's investigation and strategy for attacking the DNA

evidence was reasonable; therefore, the post-conviction court properly denied relief. We agree with the State.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn.

Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea, as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that there "is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (footnote omitted); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

### A. DNA Evidence

The Petitioner contends that Counsel's approach to suppressing the DNA evidence was deficient because the "only plausible attack on the DNA" was contamination at the TBI lab as testified to by Dr. Hampikian. The State responds that Counsel's reasonable strategy decisions regarding the DNA evidence did not prejudice the Petitioner. About this issue the post-conviction court made the following findings:

> In every case, there is a possibility that a person other than the perpetrator removes or plants evidence at the crime scene before the arrival of an officer. In this case, because the crime-scene perimeter did not include the south wall, there is also a possibility that a person other than the petitioner left the petitioner's blood on the south wall after the arrival of an officer. In this case, however, the nature of the evidence, a red transfer stain of human blood containing the [P]etitioner's and only the [P]etitioner's DNA, makes both possibilities remote because they require that another person have

access to or contact with the [P]etitioner's blood and transfer the blood to the wall without contamination by the other's [sic] person's DNA. So, too, do descriptions of the suspect as standing near a bush or tree, the location of other blood, on the south side of the porch, wearing a white rag around one hand. That the [P]etitioner, though aware of this issue, was willing to enter guilty pleas in spite of it reflects an appreciation of the weakness of the issue for the defense. . . .

Counsel, [ ] did secure funding for and consult an independent DNA expert, in the process, identifying sample size as another issue involving the DNA evidence. . . .

From Mr. Johnson's testimony, the Court gathers that his analysis of the DNA evidence in this case was consistent with laboratory practice and the controls in the instrument were negative for contamination. . . . Both counsel and the petitioner were aware of the possibility of pre-collection contamination of the DNA evidence and did not need an expert to explore that issue. Counsel did consult an independent DNA expert who did not question the laboratory procedure. . . .

The post-conviction court concluded that there was no deficiency or prejudice in counsel's performance.

The evidence does not preponderate against the post-conviction court's findings that the Petitioner was well aware of the potential for suppressing the DNA evidence based upon contamination, even if Counsel's focus was on contamination outside the laboratory rather than in the laboratory. Counsel sought and received funding for an expert witness who did not question the laboratory procedure but identified other areas for potential challenges. Furthermore, the Petitioner failed to present any evidence that the samples were contaminated. The evidence presented indicated that no contamination occurred.

Accordingly, we conclude that Counsel's strategy for attacking the DNA evidence was reasonable based upon her investigation. Counsel obtained funding for a forensic expert whom she relied upon in identifying potential challenges to the DNA evidence. She viewed and photographed the DNA evidence, visited the crime scene, employed an investigator, and devised a strategy for challenging the DNA evidence that was informed based upon her preparation. We conclude that the Petitioner has not proven by clear and convincing evidence that Counsel was deficient in this respect or that the alleged deficiency prejudiced him. He is not entitled to relief.

**B. Voluntariness of the Guilty Plea**

The Petitioner contends that he did not knowingly and voluntarily enter his plea because Counsel failed to "discover significant issues concerning contamination of the DNA evidence[.]" The State responds that the record supports the post-conviction court's conclusion that the Petitioner's plea was intelligently and voluntarily given. The post-conviction court determined:

At the time of the pleas, the petitioner was in his mid-twenties and, as his many pro se filings reflect, literate. Even if he was not familiar with criminal proceedings, he had competent counsel who discussed with him the weaknesses in the case of the prosecution and plea offers. . . .

Furthermore, the petitioner's rejection of the plea offer of twenty years and acceptance of a plea offer of fifteen years reflects a rational assessment of the charges, the strengths and weaknesses of the case for the prosecution, and his sentence exposure. The minimum sentence for the offense of first-degree murder is life imprisonment and the evidence establishing circumstances suggestive of premeditation on the shooter's part, asking for the deceased victim and opening fire upon his appearance, was very strong.

Despite some weaknesses in the evidence of identity, the possibility of tampering at the scene or contamination in the laboratory seems remote. . . . The Court therefore finds that the pleas were voluntary and intelligent .

We note that Counsel engaged in active negotiations with the State, and the Petitioner rejected an offer in which he thought the prison sentence was too lengthy. Counsel negotiated a plea agreement that reduced the first degree premediated murder charge to second degree murder. The result of the plea agreement was an effective sentence of fifteen years, a significantly lower sentence than a life sentence for first degree premediated murder. The plea agreement also resulted in concurrent sentences for all convictions, which was also to the Petitioner's benefit.

The evidence does not preponderate against the post-conviction court's findings that the Petitioner actively engaged in the negotiation process by weighing the strengths and weaknesses of his case against the State's offers. He rejected the State's twenty-year offer and instructed Counsel to offer a fifteen-year sentence. The Petitioner had completed school through the 12th grade, confirmed his understanding of the plea negotiation documents, and demonstrated his ability to read and write through pro se motions filed with the trial court. The Petitioner had entered a guilty plea in court before. The Petitioner affirmed with the trial court that he "underst[oo]d completely what [he was] doing." A

petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). The Petitioner confirmed that he was entering the plea "freely and voluntarily," but noted that he believed the State would use perjured testimony at trial. Upon further discussion, the Petitioner agreed that he understood the risk at trial and, thus, he chose to enter the nolo contendere pleas. The trial court, finding that the Petitioner's pleas were knowing and voluntary, accepted his pleas.

Accordingly, we conclude that the Petitioner has failed to prove that his pleas were entered involuntarily or unknowingly. Essentially, the Petitioner argues that if Counsel had presented a different trial strategy to him, he would have declined a sentence of fifteen years and proceeded to trial, risking exposure to a life sentence. The record evinces that Counsel was aware of some possible weaknesses in the DNA evidence. She requested funding from an expert and litigated a motion to suppress the DNA evidence. The Petitioner has not shown that Counsel was deficient in this respect or that he was prejudiced by her strategy. He is not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

- 13 -